## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION

| | | |
|---|---|---|
| Michael Billioni, | ) | Civil Action No.: 0:14-cv-03060-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| York County and Sheriff Bruce Bryant, | ) | |
| individually and in his official capacity as | ) | |
| York County Sheriff, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Michael Billioni ("Plaintiff" or "Billioni") filed this action against Defendants York County and Sheriff Bruce Bryant, individually and in his official capacity as York County Sheriff ("Sheriff Bryant"), (together "Defendants") seeking damages and injunctive relief stemming from the termination of his employment. (ECF No. 120.)

This matter is before the court on Defendants' Motion for Summary Judgment (ECF No. 145) pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff opposes Defendants' Motion in its entirety. (ECF No. 155.) For the reasons set forth below, the court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.

## I.    RELEVANT BACKGROUND TO PENDING MOTION

The facts as viewed in the light most favorable to Plaintiff are discussed as follows.

In November 2010, Plaintiff was hired as an officer at the York County Detention Center (the "Detention Center") by the York County Sheriff's Office ("YCSO"). (ECF No. 145-6 at 20:9–11, 22:12–14 & 33:17–19.) "Several years later, Billioni was promoted to corporal and assigned to the position of Master Control Specialist." (ECF Nos. 145-2 at 2 & 155 at 2 (referencing ECF No. 145-6 at 34:8–17.) "Master Control functions as the eyes and ears of the

Detention Center and controls access to various areas within it." (ECF Nos. 145-2 at 2 & 155 at 2 (referencing ECF No. 145-6 at 32:6–20.) "In that position, Billioni was in a central control area and had access to the video system in the Detention Center." (ECF Nos. 145-2 at 2 & 155 at 2 (referencing ECF No. 145-6 at 32:6–20.) Therefore, Plaintiff had "access to the cameras that record activities in the jail." (ECF No. 155 at 3 (referencing ECF No. 145-6 at 227).)

Early on the morning of Sunday, October 20, 2013, an inmate named Joshua Grose ("Grose") died while being held in the Detention Center. Later that afternoon, the YCSO's public information officer, Trent Faris, held a press conference, which Plaintiff watched while off duty. (ECF No. 145-6 at 44:11–25.) Faris provided the following statement regarding the Grose incident:

> Good afternoon. My name is Trent Faris, Public Information Officer for the York County Sheriff's Office. To my right is Deputy Kim Morehouse, she's the assistant public information officer and our crime prevention officer. Today I'm going to give you some more information about the events that took place Friday night and throughout the weekend by Joshua Matthew Grose in a case involving him. On Friday night shortly after 11 p.m., Joshua Matthew Grose was booked into the York County Detention Center for charges of murder, attempted murder, and grand larceny. From that time he was booked into the Detention Center, Mr. Grose was very uncooperative with Detention Center officers and staff. Early this morning, Mr. Grose attempted to drown[] himself in his cell toilet and he also hit his head on his cell wall several times. Detention - - detention officers restrained Mr. Grose by putting him in a re[s]training chair for his safety, other inmates' safety and detention officer safety. Once in the chair, Mr. Grose was still very combative and kept hitting his head on the back of the chair, restraint chair. Officers then attempted to place a helmet on Mr. Grose's head to prevent him from further injury. At that time, officers noticed a laceration on the back of Mr. Grose's head. EMS was called to assess his injuries. This - - this was at approximately between 1:20 a.m. and 1:46 a.m. this morning. Mr. Grose was so combative and aggressive, a full medical exam could not be performed at the time. According to the EMS crew, the lacerations did not require stitches, so the decision was made not to transport him to the hospital. At 2:20 a.m., during normal rounds, detention officers found Mr. Grose unresponsive. CPR was immediately performed and EMS was called back to the Detention Center at 2:20 a.m. CPR was performed at 2:20 - - 2:20 a.m. to 2:29 a.m. And according to EMS, it appears that Mr. Grose was in cardiac arrest when they arrived the second time. He was then transported to Piedmont Medical Center where CPR was

performed from here until there. Joshua Matthew Grose was pronounced dead shortly thereafter this morning at the emergency room at 3:05 a.m. An autopsy will be performed on Mr. Grose tomorrow, Monday, October 21st. The State Law Enforcement Division or SLED is investigating. Currently, there are 369 inmates housed in the York County Detention Center and we had 20 officers on duty last night. As far as the investigation from Friday night's incident, I have incident reports and warrants for you. I'll give those to you later, but just a quick synopsis of what took place Friday night. We believe that in an attempt to steal Mrs. Thomas' vehicle, Grose struck her with the vehicle as he was leaving. Grose then goes to Mrs. Grose, the second victim's house, and physically assaults her and hits her also with the car. In the process, he also assaulted a third victim. We're still trying to get the motive of why this took place on Friday night and we don't want to speculate on the motive until all the facts are gathered in the case. We don't have much else to say, but I'll take a few questions at this time.

(ECF No. 145-10 at 56:21–59:21.) In response to a question regarding whether any officers would be placed on administrative leave, Faris answered "[a]ll our officers, detention officers, did exactly what they were supposed to do last night" regarding the incident involving Grose. (ECF No. 145-10 at 61:9–14.)

Plaintiff "was not on duty when Grose died, he returned to work his shift at 5:30 pm the next day, Monday, October 21, 2013." (ECF No. 155 at 3 (referencing ECF No. 145-6 at 41:6–18).) Because he did not believe Faris' report of propriety by the Detention Center's officers (ECF No. 145-6 at 49:15–25), Plaintiff watched the recording of the Grose incident several times and concluded that he "saw a struggle with an inmate that turned into [correctional officer] James Moore punching this inmate 12 times." (Id. at 47:14–48:4.) Additionally, Plaintiff was concerned with the method used by correctional officers to secure a protective helmet on Grose's head and the taser setting that was used during the incident and that EMS came in and did not lay a hand on Grose. (Id. at 50:20–55:10.) Plaintiff expressed his concerns to his partner, Paul Aube. (Id. at 56:13–25.)

At home after work on the morning of October 22, 2013 (id. at 70:1–17), Plaintiff told his wife what he saw on the video of Grose, i.e., that he was "struck 12 times[] in the course of the

incident that led to his death" and "that other officers[1] were there and did nothing." (Id. at 65:2–22.) Plaintiff's wife worked as a research analyst[2] for WCNC, the NBC affiliate in Charlotte, North Carolina. (Id. at 70:18–20.) After the conversation with Plaintiff, Plaintiff's wife e-mailed details about the Grose incident to unspecified individuals at WCNC. (Id. at 76:5–77:2.)

After Plaintiff's wife conveyed information regarding Grose to WCNC, Stuart Watson, a reporter from the television station, sent a request pursuant to the Freedom of Information Act ("FOIA") to the YCSO. (ECF No. 145-10 at 70:1–72:11.) In addition, Watson contacted Kristie Jordan, Sheriff Bryant's general counsel, making inquiries that conveyed detailed information about the Grose incident and suggested criminal conduct by the Detention Center's officers. (ECF No. 145-8 at 106:2–108:1; see also ECF No. 145-7 at 74:19–75:5.) After hearing about Watson's requests for information, Sheriff Bryant became concerned about allegations of criminal conduct by the Detention Center's officers that he did not have knowledge of at the time. (Id.; see also ECF Nos. 145-8 at 113:11–20 & 145-9 at 6:23–10:11.) At a subsequent meeting in the afternoon of October 22, 2013, Sheriff Bryant "ordered his staff to look into the allegations and determine if there was a witness who saw something that had not been reported." (ECF No. 145-2 at 3 (referencing, e.g., ECF No. 145-7 at 77:1–78:25).)

Because they knew Plaintiff's wife worked for WCNC, Chief Administrator James Arwood and Assistant Administrator Richard Martin decided to start the internal administrative investigation ordered by Sheriff Bryant by first interviewing Plaintiff. (ECF Nos. 145-6 at 95:4–20 & 145-7 at 119:2–23.) Before beginning the interview, Martin and/or Arwood advised

---

[1] Plaintiff identified the other officers as Lieutenant Connie McMillan, Sergeant Lindsay Hinson, Sergeant J.T. Strait, and Officer James Moore. (ECF No. 145-6 at 71:25–72:3.)

[2] As a research analyst, Plaintiff's wife was responsible for determining "how many people are watching their TV station" and did not have a role in "feeding news stories to the reporters." (ECF No. 145-6 at 70:18–71:3.)

Plaintiff that if he "refuse[d] in this administrative investigation to truthfully answer any questions related to your performance of your duties or to the fitness for your duties, you will be subject to departmental charges, which could result in your dismissal from the York County Sheriff's Office." (Id. at 97:5–12; see also ECF No. 145-6 at 244.) During the interview, Plaintiff admitted to watching the video of the Grose incident, but denied that he discussed the video with anyone outside of the YCSO. (ECF No. 145-6 at 99:12–101:4.) Plaintiff states that he did not tell the truth about what he told his wife because he was "scared of losing my job" and "afraid that I'd end up getting folded into a criminal investigation."[3] (Id. at 106:3–9.)

At approximately 6:43 a.m. on the morning of October 23, 2013, Plaintiff sent Martin and Arwood an e-mail requesting that they contact him because he needed to tell them something. (Id. at 245.) At approximately 8 a.m., Plaintiff told Arwood that Plaintiff knew "that WCNC had the story about what was going on, what actually happened to Joshua Grose and that I could get them to stop it." (Id. at 116:11–17 & 117:16–24.) In response to Plaintiff, Arwood stated that he was not interested in stopping any story. (Id. at 118:3–9.) Later on at 1:29 p.m. on October 23, 2013, Plaintiff sent Martin and Arwood an e-mail stating that Plaintiff "need[ed] to get something off my conscience . . . ." (Id. at 251.) Thereafter, at 3:13 p.m., Plaintiff sent Martin and Arwood the following e-mail:

> I wanted to talk to you over the phone about this situation but I realize that you both may be busy so I will not take up much of your time. I am responsible solely for the mess this has created and I accept full responsibility for my actions. I did tell my wife things that were in that video and in turn she, without my knowledge

---

[3] Plaintiff further added:

> I was afraid I was going to lose my job because their dirty little secret got out that everything didn't go down exactly the way it was supposed to go down. This officer beat the inmate. He had beaten inmates before, and now it's out.

(ECF No. 145-6 at 107:1–6.)

passed that information on. I only learned of this when I told my wife of my investigation, which is also in clear violation of the policy. I didn't expect anything to go any further than her, and she has stated she went without my knowledge and without my wishes with that information. After discussions with my wife, she has requested that they discontinue looking into this situation and they have agreed to drop everything on their end. Other than me, my wife, and the NBC Charlotte news director nobody else knows of this and it will stop. I realize that I have not upheld the oath I swore to and all I can say to that is I am sorry. There is nothing I can do to make this right other than get this off my chest, and absolve the other people you wish to question that had nothing to do with this. I do realize I may be burning a bridge that had already been on fire with this situation, and I know now that I did the wrong thing. I take full responsibility for my actions and I accept any punishment that is due to me. I have no excuse for my lapse in judgment and believe that I have started to learn my lesson, and I also know I need to do a little soul searching and grow up. If you need me to report in, I am able to be there about or after 5:30 this evening, as I have my child at this time and my wife returns home at 5. Again I am responsible and I want those who weren't directly involved into my actions to be not held to account for my stupidity.

(Id. at 253.) Arwood responded telling Plaintiff that they would discuss the issue at a later date.

(Id. at 123:8–12.)

At approximately 2 p.m. on October 25, 2013, Plaintiff met for 2 hours with an agent of the South Carolina Law Enforcement Division ("SLED"). (Id. at 123:13–124:16.) Plaintiff gave the SLED agent a written statement documenting events starting when Plaintiff viewed the video of Grose and ending with his e-mail at 3:13 p.m. on October 23, 2013. (Id. at 254–55.) Although he told the SLED agent he feared losing his job and thought he could be charged with a crime, Plaintiff did not include that information in his written statement. (Id. at 125:23–126:20.) Plaintiff then met with Arwood and Martin, who gave Plaintiff the choice to either resign or be fired. (Id. at 130:1–3.) Plaintiff chose to be fired. (Id. at 130:3.) Immediately thereafter, Plaintiff received a Notice of Termination stating that his termination was "based upon violations of Sheriff[']s Office/York County Rules, Regulations and Policy: 300:16 Code of Ethics, VIII.

Employee Rules of Conduct, 16.[4] and VII.[5] Confidential Information." (ECF No. 145-6 at 260.)

Sheriff Bryant then issued a Personnel Order to select individuals[6] at the Detention Center about

Plaintiff no longer being employed there. (Id. at 261.) In addition, on or about October 13,

2013, Martin submitted a Personnel Change in Status Report Notification of

Administrative/Routine Separation to the South Carolina Criminal Justice Academy ("SCCJA")

to inform it that Plaintiff was terminated "for violation of AGENCY policy NOT involving

misconduct as defined in S.C. Reg. 38-004 (i.e., substandard performance, excessive

---

[4] Rule of Conduct No. 16 provides:

> Employees will comply will[sic] all Federal, State, and local laws and ordinances and immediately report any violation. Employees will not make any false statements, or intentionally misrepresent or mislead facts. Employees are required to answer questions and cooperate fully in the course of any internal investigation whether conducted by the Detention Center or other authorized external agency.

(ECF No. 145-6 at 223 ¶ 16.)

[5] Section VII provides:

> 1. Inmate and employee records are considered confidential information. No employee is to divulge information pertaining to inmates and/or employees of the Detention Center except for official business purposes and then only authorized persons and agencies with official need to know. All employees will treat all Detention Center communications and business as confidential.
> 2. Employees are not to discuss information pertaining to inmates and/or employees except for official business purposes and then only with those persons who have an official reason to know the information.
> 3. Employees will not use confidential information obtained in the courts of official duty for actual or anticipated gain. Employees found in violation of this policy will be prosecuted in accordance with State and Federal statutes.

(ECF No. 145-6 at 221 § VII ¶¶ 1–3.)

[6] Major Robert J. Hudgins, Undersheriff; Chief James F. Arwood, Chief Administrator; Assistant Chief Richard L. Martin, Jr., Assistant Administrator; Captain Gary L. Davies, Security Commander; Lieutenant Cheryl H. Guzman, Administrative Lieutenant; Lieutenant Ben Howley, Training Lieutenant; Sergeant John C. Hicks, Jr., Professional Standards Officer; Corporal James E. Long, Systems Technician Officers; Cherie Dalley, Executive Assistant to the Sheriff; Jean M. McDaniel, Administrative Clerk; Lisa S. Davidson, York County Human Resources Director; and Employee Personnel File. (ECF No. 145-6 at 261.)

absenteeism, sleeping on duty, etc.).” (<u>Id.</u> at 262.)  Plaintiff did not file a grievance regarding his termination because he was not aware he could grieve it.  (<u>Id.</u> at 149:25–151:10.)

On November 12, 2013, the YCSO held a second press conference where it showed assembled media members the camera footage from the Grose incident.  (ECF No. 145-10 at 83:1–13.)   At the November 12, 2013 press conference, the following exchange allegedly occurred:

> Sheriff Bryant was asked a question by Stuart Watson - - Well, let me back that up a little bit.  Sheriff Bryant was talking about how the actions of the officers on that night were - - again, I’m going to paraphrase - - were heroic, and they did everything that they could.  And he said that he had not found any fault on - - by any officer concerning this death or the other death, which I’m assuming to be Jeffrey Waddell.  Stuart Watson then asked the question, then why did you fire Mike Billioni?  Sheriff Bryant looked down at the floor, and he looked back up and very, very agitated said, that man was terminated, and I believe you know the answer.  And he started to yell at Stuart and point his finger at him saying, out of all the people in this room, you know the answer to that question, and then refused to let Stuart Watson ask any further questions for the duration of the press conference.

(ECF No. 145-6 at 134:12–135:5.)

On July 31, 2014, Plaintiff filed a Complaint in this court against Sheriff Bruce Bryant, the Detention Center, York County, and the YCSO alleging the following causes of action: (1) a claim pursuant to 42 U.S.C. § 1983 for violation of the First Amendment right to free speech; (2) a claim for violation of the South Carolina Whistleblower Statute (“Whistleblower Act”), S.C. Code Ann §§ 8-27-10 to -60 (1976); (3) a claim for retaliation in violation of public policy; (4) a claim pursuant to section 1983 for violation of the Fourteenth Amendment right to due process; (5) a claim for wrongful discharge in violation of public policy; and (6) a claim for failure to pay overtime wages in violation of the Fair Labor Standards Act of 1938 (“FLSA”), 29 U.S.C. §§ 201–219.  (ECF No. 1 at 14–21.)  After the court granted his Motion to Amend the Complaint on March 16, 2015 (ECF No. 43), Plaintiff filed an Amended Complaint against only Sheriff Bryant

alleging the following causes of action: (1) a claim pursuant to section 1983 for violation of the First Amendment right to free speech; (2) a claim for violation of the Whistleblower Act; (3) a claim for retaliation and wrongful violation of public policy; (4) a claim pursuant to section 1983 for violation of the Fourteenth Amendment right to due process; (5) a claim for failure to pay overtime wages in violation of the FLSA; and (6) a claim for violation of the South Carolina Payment of Wages Act ("SCPWA"), S.C. Code Ann. §§ 41-10-40 to -50 (1986).  (ECF No. 44 at 15–23.)

On April 6, 2015, Sheriff Bryant filed a Motion for Partial Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (ECF No. 48.)  On August 18, 2015, the court granted Sheriff Bryant's Motion for Partial Judgment and barred Plaintiff's First Amendment right to free speech and Fourteenth Amendment right to due process claims against Sheriff Bryant in his official capacity and Plaintiff's remaining claims alleging violation of the Whistleblower Act, the FLSA, the SCPWA, and public policy.  (ECF No. 59 at 22.)  As a result of the court's August 18, 2015 Order, the only surviving claims were Plaintiff's section "1983 claims for prospective injunctive relief against Defendant [Bryant] in his official capacity and Plaintiff's § 1983 claims against Defendant in his individual capacity."  (Id.)

Plaintiff filed a Second Motion to Amend on March 29, 2016.  (ECF No. 91.)  After the court granted his Second Motion to Amend on May 13, 2016 (ECF No. 117), Plaintiff filed a Second Amended Complaint against York County and Sheriff Bryant alleging the following causes of action: (1) a claim pursuant to section 1983 against Sheriff Bryant for violation of the First Amendment right to free speech; (2) a claim pursuant to section 1983 against York County for violation of the First Amendment right to free speech; and (3) a claim pursuant to section 1983 against Defendants for violation of the Fourteenth Amendment right to due process.  (ECF

No. 120 at 15–19.)  Defendants answered the Second Amended Complaint on June 8, 2016, denying its allegations.  (ECF Nos. 128 & 129.)  On January 10, 2017, Defendants filed their Motion for Summary Judgment.  (ECF No. 145.)  Plaintiff filed a Response in Opposition to Defendants' Motion for Summary Judgment on February 9, 2017, to which Defendants filed their Reply to Plaintiff's Opposition to Motion for Summary Judgment on March 2, 2017. (ECF Nos. 155 & 161.)

The court heard argument from the parties on the instant Motion at a hearing on April 19, 2017.  (ECF No. 167.)

## II.    JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims against Defendants under 42 U.S.C. § 1983, which permits an injured party to bring a civil action against a person who, acting under color of state law, ordinance, regulation, or custom, causes the injured party to be deprived of "any rights, privileges, or immunities secured by the Constitution and laws."  Id.

## III.    LEGAL STANDARD

A.    Summary Judgment under Rule 56

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248–49 (1986).  A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

B.    First Amendment Rights

The First Amendment of the United States Constitution protects the freedom of speech by providing that "Congress shall make no law . . . abridging the freedom of speech."[7] U.S. Const. amend. I. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000) (citing ACLU v. Wicomico Cty., Md., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); Pickering v. Bd. of Educ., 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech")). "However, not

---

[7] Freedom of speech under the First Amendment can encompass "spoken or written word" and communicative conduct. See Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 409 (1974) ("[C]onduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment.'")).

every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." Id. (citation omitted). "Rather, a § 1983 retaliation plaintiff must demonstrate that the defendant's actions had some adverse impact on the exercise of the plaintiff's constitutional rights." Id. (citation omitted).

"It is well established that government workers do 'not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of [their] employment.'" Crouse v. Town of Moncks Corner, 848 F.3d 576, 582 (4th Cir. 2017) (quoting City of San Diego v. Roe, 543 U.S. 77, 80 (2004)).

The Court of Appeals for the Fourth Circuit has set forth a three-part standard for when a government employee[8] pleads a First Amendment § 1983 retaliation claim. Id. at 583. "The first prong asks whether the employee 'was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest.'" Id. (quoting McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)). "This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, . . . and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" Id. (internal and external citations omitted). "If the speech was made as a citizen and addressed a matter of public concern, the second prong of the test requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services." Id. (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). "If a court determines that the employee's interest outweighed the government employer's interest, the third prong requires a determination that the employee's speech caused the

---

[8] Under South Carolina law, a government/public employee is "one who merely performs the duties required of him by persons employing him under an express contract or otherwise, though such persons be themselves public officers, and though the employment be in or about a public work or business, . . . ." Sanders v. Belue, 58 S.E. 762, 763 (S.C. 1907).

disciplinary action." Id. (citing McVey, 157 F.3d at 277–78).  "The first two prongs of this test are questions of law, while the third is a factual inquiry."  Id. (citing Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012)).  "Because the first two prongs of the test are questions of law, an employer is entitled to qualified immunity if either prong cannot be resolved under clearly established law."  Id.

C.    Right to Due Process

    The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1.  "The Fourteenth Amendment does not protect against all deprivations of liberty."  Baker v. McCollan, 443 U.S. 137, 145 (1979).  "It protects only against deprivations of liberty accomplished 'without due process of law.'"  Id.

    Due process includes both procedural and substantive components.[9]  In order to establish a violation of procedural due process, a plaintiff must show that: (1) "he had a constitutionally cognizable life, liberty, or property interest"; (2) "the deprivation of that interest was caused by 'some form of state action'"; and (3) "'the procedures employed were constitutionally inadequate.'"[10]  Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) (internal and external citations omitted).  Procedural due process requires, at a minimum, fair notice and an opportunity to be heard.  Matthews v. Eldridge, 424 U.S. 319, 333 (1976).

    "A property interest exists when one has a legitimate claim of entitlement to a right arising

---

[9] Plaintiff has expressly specified that his claims are procedural in nature.  (E.g., ECF No. 120 at 18 ¶¶ 111, 112 & 117.)

[10] "Procedural due process simply ensures a fair process before the government may deprive a person of life, liberty, or property, Wolf v. Fauquier Cnty. Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009), but "does not require certain results," Tri–Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 436 (4th Cir. 2002)."  Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013).

from such sources as state statutes, local ordinances, and employment contracts." <u>Bunting v. City of Columbia</u>, 639 F.2d 1090, 1093 (4th Cir. 1981); <u>see also</u> <u>Turner v. Richmond Public Schs.</u>, C/A No. 3:16cv256, 2017 WL 1179162, at *6 (E.D. Va. Mar. 28, 2017) ("A property interest protected by procedural due process must be 'a legitimate claim of entitlement' created not by federal law, but by 'existing rules or understandings that stem from an independent source such as state law.'") (citation omitted). "[A] loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest." <u>Shirvinski v. U.S. Coast Guard</u>, 673 F.3d 308, 315 (4th Cir. 2012) (citing <u>Ridpath v. Bd. of Governors Marshall Univ.</u>, 447 F.3d 292, 309 (4th Cir. 2006)). "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." <u>Sciolino v. City of Newport News, Va.</u>, 480 F.3d 642, 646 (4th Cir. 2007) (citing <u>Stone</u>, 855 F.2d at 172 n.5).

D.    <u>Qualified Immunity</u>

Under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." <u>Tolan v. Cotton</u>, ___ U.S. ____, 134 S. Ct. 1861, 1865 (2014). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" <u>Id.</u> (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly

established' at the time of the violation." Id. at 1866 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  For the second prong, "'the salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" Id. (quoting Hope, 536 U.S. at 741).  "Courts have discretion to decide the order in which to engage these two prongs." Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009).

## IV.   ANALYSIS

A.     The Parties' Arguments

*1.  Claims Generally Against York County*

Defendants argue that York County is entitled to dismissal of the § 1983 claims alleged against it.  (ECF No. 145-2 at 6.)  In support of this argument, Defendants assert that the only way York County can be potentially liable to Plaintiff is if Sheriff Bryant was acting on behalf of York County when he took action against Plaintiff.  (Id. at 7.)  In this regard, Defendants assert that because York County does not have any authority over the Detention Center's employees or its administration, Sheriff Bryant "was not acting for the County when he terminated Billioni." (Id. at 8–9 (citing, e.g., Patel by Patel v. McIntyre, 667 F. Supp. 1131, 1146 n.26 (D.S.C. 1987) ("[T]he sheriff and the county are distinct and separate entities in South Carolina and the sheriff's actions or failures to act do not give rise to a section 1983 action against the county.") (citations omitted); Cobb v. South Carolina, C/A No. 2:13-cv-02370-RMG, 2014 WL 4220423, at *7 (D.S.C. Aug. 22, 2014) ("As this Court has previously noted, 'the sheriff and the county are distinct and separate entities in South Carolina and the sheriffs actions or failures to act do not give rise to a section 1983 action against the county.'") (citation omitted)).)  "Consequently, the County bears no liability for Sheriff Bryant's actions even if, as Billioni alleges, they were

constitutionally infirm." (Id.)

Plaintiff opposes dismissal of York County. (See generally ECF No. 155 at 28–31.) Plaintiff argues that Sheriff's Bryant's termination of his employment was an act of "final policymaking on behalf of York County, and therefor[e] York County is liable under Monell v. Dept. of Soc. Serv[s]., 436 U.S. 658 (1978)." (ECF No. 155 at 29.) In support of his position, Plaintiff focuses on details of the relationship between the YCSO and York County to include that York County (1) provides "human resources and personnel functions" for the YCSO, (2) fully funds both the YCSO and the Detention Center and (3) receives services provided by the YCSO to include "civil process, operation of the County Court, providing court security, prisoner detention, and full service law enforcement outside of the municipalities in York County." (ECF No. 155 at 11–14.) As a result, Plaintiff contends that York County is subject to § 1983 liability in this matter because of its connection with the YCSO.

### 2. Claim Against Sheriff Bryant for Violating First Amendment Right to Free Speech

In response to Plaintiff's assertions that he was terminated for disclosing facts about the Grose incident to his wife, Sheriff Bryant maintains that he terminated Plaintiff for lying. (ECF No. 145-8 at 20:24–21:24.) In conjunction with the foregoing, Sheriff Bryant asserts that because Plaintiff was terminated for his dishonesty, the termination does not violate the First Amendment since "government employees have no constitutional right to lie during non-criminal, internal investigations even if their motives are pure – or at least the employees think their motives are pure."[11] (ECF No. 145-2 at 24 (citing LaChance v. Erickson, 522 U.S. 262,

---

[11] Sheriff Bryant also asserts that to the extent Plaintiff was terminated for violating the Detention Center's confidentiality policy, the termination does not violate the First Amendment because "a law enforcement officer has no First Amendment right to leak information that he or other officers have gathered in their official roles, especially where the 'leak' violates work rules

265–67 (1998)).)  Sheriff Bryant further asserts that dismissal of the First Amendment claim is appropriate because Plaintiff "has not identified any evidence from which a reasonable juror should conclude that he would not have been terminated for lying to internal investigators but for the content of the speech he engaged in . . . ."  (Id. at 28.)

Plaintiff asserts that the statements to his wife about the Grose incident were made as a citizen and not as an employee.  (ECF No. 155 at 18.)  Moreover, what he told his wife was a matter of public concern since it involved "[m]isconduct by public employees of a jail, . . . possibly causing, or contributing to, the death of a man in their custody and control, . . . ."  (Id.)  Since he "was fired within hours of the Sheriff learning that he had admitted telling his wife about the incident," Plaintiff argues that "he has made a prima facia[sic] showing that his conduct was the reason he was fired."  (Id. at 19 (citing Hartman v. Moore, 547 U.S. 250, 260 (2006)).)  In response to Sheriff Bryant's statement that he was fired for lying, Plaintiff asserts that (1) case law in the Fourth Circuit clearly does not hold "speech released in violation of confidentiality policies" lacks First Amendment protection and (2) "[i]t is far more reasonable to believe he was fired for revealing the misconduct surrounding Grose's death, rather than because for a few hours he denied doing so."  (Id. at 21, 22.)  In this regard, Plaintiff argues that "[t]he circumstances surrounding Plaintiff's firing are sufficient to create a question of fact concerning the reason he was fired."  (Id. at 25.)

3. *Claim Against Defendants for Violating Fourth Amendment Right to Due Process*

Defendants argue that Plaintiff's procedural due process claim fails because (1) "Billioni was an at-will employee and, as such, lacked a property interest in continued employment" and

---

that the officer has acknowledged."  (ECF No. 145-2 at 20 (citing Jurgensen v. Fairfax Cty., Va., 745 F.2d 868, 878–884 (4th Cir. 1984)).)

(2) Sheriff Bryant "did not infringe any constitutionally protected liberty interest in terminating Billioni." (ECF No. 145-2 at 10.) As to the property interest issue, Defendants assert that at-will employment is presumed by both South Carolina common law and statutory law. (Id. at 12 (citing Barron v. Labor Finders of S.C., 713 S.E.2d 634, 636 (S.C. 2011); S.C. Code Ann. § 4-9-30(7) (Supp. 2015)).) As a result, Plaintiff did not have a legitimate claim of entitlement to continued employment and, therefore, lacks a constitutionally protected property interest in his employment. (Id. at 13.) Defendants further assert Plaintiff cannot show infringement on a liberty interest because he neither requested a hearing nor has come forward with evidence demonstrating that Sheriff Bryant "made public the reasons for his termination" and/or disclosed reasons for his termination that were factually false. (Id. at 14–15.)

Even though he was an at-will employee, Plaintiff argues that he can "establish a due process claim based on the deprivation of a liberty interest where an employer has deprived the employee of the 'freedom to take advantage of other employment opportunities.'" (ECF No. 155 at 31 (citing Ridpath, 447 F.3d at 307).) More specifically, Plaintiff asserts that "Defendants published [a] stigmatizing allegation in his termination letter" and placed "reports in the Plaintiff's personnel file without granting a name-clearing hearing," which information made it "highly unlikely that Billioni would be able to obtain another job in law enforcement." (Id. at 31–32.) In addition, Plaintiff asserts that Sheriff Bryant's comments at the November 12, 2013 press conference held after his termination "indicated that Billioni had done something inappropriate that caused him to lose his position." (Id. at 32.) Because "Plaintiff was not provided with a hearing before the Defendants published these false and stigmatizing remarks," Plaintiff asserts that he has established "a genuine issue of material fact regarding a procedural due process claim." (Id.)

18

### 4. *Qualified Immunity*

Sheriff Bryant argues that qualified immunity shields him from individual liability on Plaintiff's constitutional claims. (ECF No. 145-2 at 28–29.) Regarding Plaintiff's due process claims, Sheriff Bryant asserts that his actions in 2013 (i.e., terminating his at-will employment, notifying the CJA and other Detention Center staff about the termination) did not violate a clearly established constitutional right of Plaintiff. (Id. at 30.) As to the First Amendment claim, Sheriff Bryant asserts that "the state of the law at the time of Billioni's termination would not have made it clear to 'every reasonable official' that disciplining Billioni because of his violation of the confidentiality policy, regardless of the content of what he disclosed, violated his First Amendment rights." (Id. at 31.) Moreover, "because preexisting law had not settled beyond debate in 2013 that disciplining Billioni because he lied, disobeyed policy and engaged in protected speech violated clearly established federal law, Sheriff Bryant is entitled to qualified immunity." (Id. at 32 (citation omitted).)

Because he has established a violation of his First Amendment right to speak as a citizen about a matter of public concern, Plaintiff opposes Sheriff Bryant's assertion of qualified immunity on the basis that "speech revealing serious governmental misconduct by law enforcement personnel has long been recognized as speech protected by the First Amendment." (ECF No. 155 at 27 (citing Andrew v. Clark, 561 F.3d 261(4th Cir. 2009)).) Therefore, Plaintiff urges the court to reject Sheriff Bryant's claim of qualified immunity. (Id.)

### B.     The Court's Review

### 1. *York County as a Defendant*

Under the right circumstances, York County is the type of local government entity that may be sued under § 1983. E.g., Temple v. Oconee Cty., C/A No. 6:13-144-JFA-KFM, 2014

WL 4417702, at *13 (D.S.C. Sept. 8, 2014) (citing <u>Lake Country Estates, Inc. v. Tahoe Reg'l</u> <u>Planning Agency</u>, 440 U.S. 391, 401 (1979)).  To impose liability on a municipality or other local government entity, a plaintiff must identify a "'policy' or 'custom' that caused the plaintiff's injury."  <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997) (quoting <u>Monell</u>, 436 U.S. at 694).  "Locating a 'policy' ensures that a municipality [or local government entity] is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality [or the local government entity]."  <u>Id.</u> at 403–04; <u>see also, e.g.</u>, <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999) ("Municipal policy may be found in written ordinances and regulations . . . in certain affirmative decisions of individual policymaking officials . . . or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens.") (internal and external citations omitted).  "When a plaintiff protests a single employment decision involving no violation pursuant to a municipal [or local government] policy and the decision was made by an official without final policymaking authority, the municipality [or local government entity] is not liable for § 1983 violations."  <u>Bryant v. Village of Bald Head Island,</u> <u>N.C.</u>, No. 7:14-cv-223-H, 2017 WL 1194347, at *7 (E.D.N.C. Mar. 30, 2017) (citing <u>Greensboro</u> <u>Prof'l Fire Fighters Ass'n, Local 3517 v. City of Greensboro</u>, 64 F.3d 962, 963, 966 (4th Cir. 1995)).

In this matter, Plaintiff seeks to hold York County liable for claims arising out of the alleged conduct of Sheriff Bryant and the correctional officers he employs to operate the Detention Center.  Plaintiff argues that York County is liable because Sheriff Bryant had final decision-making authority to establish county policy with respect to Plaintiff's termination. "[W]hether an official had final policymaking authority is a question of state law."  <u>Pembaur v.</u>

City of Cincinnati, 475 U.S. 469, 483 (1986).  In this regard, Plaintiff's position ignores that, by statute, the Detention Center is under the control of Sheriff Bryant and is not under the control of York County.  See S.C. Code Ann. § 24-5-10 (Westlaw 2017); see also Roton v. Sparks, 244 S.E.2d 214, 216 (S.C. 1978) ("The 'detention center' maintained by Newberry County is the county jail within the meaning of Sections 24-5-10 of the 1976 Code of Laws, and is subject to the supervision of the sheriff.").  Plaintiff's position further ignores that York County and Sheriff Bryant are "distinct and separate entities" such that correctional officers are solely employed and supervised by Sheriff Bryant.  See Edwards v. Lexington Cnty. Sheriff's Dep't, 668 S.E.2d 125, 127 n.1 (S.C. 2010). ("However, under South Carolina law, the sheriff and sheriff's deputies are State, not county employees."); Patel v. McIntyre, 667 F. Supp. 1131, 1146 n.26 (D.S.C. 1987) ("The sheriff does not act as the 'county policymaker' as to law enforcement matters in South Carolina. He is not responsible for establishing 'binding county policy respecting [law enforcement] matters and [for adjusting] that policy for the county in changing circumstances.' Instead, the sheriff and the county are distinct and separate entities in South Carolina and the sheriff's actions or failures to act do not give rise to a section 1983 action against the county.") (internal and external citations omitted); Allen v. Fid. & Deposit Co., 515 F. Supp. 1185, 1189–91 (D.S.C. 1981) (County cannot be held liable for actions of deputy sheriff because deputy sheriffs serve at pleasure of the Sheriff, not the County); see also Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999) ("As the county has no control over policy within the jail, it bears no concomitant responsibility.") (citing Monell, 436 U.S. at 694.)

However, even assuming York County could be held responsible for the actions of Sheriff Bryant and the Detention Center's correctional officers, Plaintiff's evidence fails to demonstrate that his termination occurred in furtherance of any policy, custom, or practice of

York County, its agencies, or officials. See Monell, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Accordingly, the court finds that York County is entitled to summary judgment on the claims alleged against it.

### 2. *Free Speech Claims Against Sheriff Bryant*

In this matter, Plaintiff asserts protection under the First Amendment for comments made to his wife on October 22, 2013, regarding what Plaintiff saw on a video recording of the incident that led to Joshua Grose's death. The first inquiry in a First Amendment § 1983 action is to determine whether Plaintiff "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." Crouse, 848 F.3d at 583. "Determining whether speech was made in the course of an employee's job requires courts 'to engage in a 'practical' inquiry into the employee's 'daily professional activities.''" Id. at 584 (quoting Hunter v. Town of Mocksville, 789 F.3d 389, 397 (4th Cir. 2015)). Upon review of the job description for a Master Control Specialist (see ECF No. 145-6 at 227–230), the court finds that Plaintiff was not acting in the course of his ordinary employment or pursuant to his official job duties as a Master Control Specialist when he discussed the Grose incident with his wife at home while off duty. Therefore, the court is persuaded that Plaintiff has introduced sufficient evidence for a reasonable juror to conclude that Plaintiff was speaking as a citizen and not as a government employee.

The court is further persuaded that the content of Plaintiff's speech, which involved allegations of "misconduct by public employees . . . possibly causing, or contributing to, the death of a man in their custody and control," raised a matter of public concern. See Edwards v.

City of Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999) ("We have explained that the answer to the public concern inquiry rests on 'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'  In performing the public concern inquiry, we must examine the content, context, and form of the employees's speech in light of the entire record.") (citations omitted).  More specifically, the court is persuaded after examining the content and context of Plaintiff's speech that statements describing alleged misconduct by correctional officers in a situation wherein an inmate died constituted matters of public concern.  Brawner v. City of Richardson, Tex., 855 F.2d 187, 191–92 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department.").

If Plaintiff engaged in speech as a citizen on a matter of public concern, the court must next balance "the public employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient government through its employees." Crouse, 848 F.3d at 585 (quoting McVey, 157 F.3d at 278).  "For this inquiry, courts 'must take into account the context of the employee's speech . . . and the extent to which it disrupts the operation and mission of the agency.'"  Id. (quoting McVey, 157 F.3d at 278).  Upon review, the court observes that Sheriff Bryant did not make any showing of disruption within the YCSO due to the statements made by Plaintiff to his wife.  However, even if the court takes into consideration any disruption caused by the internal investigation that was conducted by the YCSO, such disruption is clearly outweighed "by the public's interest in the disclosure of misconduct or malfeasance."  Brawner, 855 F.2d at 192.  Therefore, the court finds that

Plaintiff's interest in speaking on a matter of public concern was greater than Sheriff Bryant's interest in preventing workplace disruption.

As to the third element of a First Amendment § 1983 claim,[12] Plaintiff "must show that his protected expression was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993) (citation omitted). In this case, Plaintiff has presented sufficient evidence for a reasonable juror to find that he was fired substantially for his speech. There is obviously a strong temporal link between when Sheriff Bryant learned about Plaintiff's speech on October 23, 2013, and Sheriff's Bryant's decision to fire Plaintiff on October 25, 2013. Moreover, in contrast to Sheriff Bryant's claims that he fired Plaintiff for lying, several documents in the record (i.e., the Notice of Termination[13] provided to Plaintiff and NET-101[14] filed with the South Carolina Department of Employment and Workforce) contradict Sheriff Bryant's assertions and/or support Plaintiff's assertion that he was fired for the statements he made to his wife about the Grose incident. In consideration of the foregoing, the court finds that a reasonable finder of fact could conclude from this evidence that Plaintiff's protected speech was a substantial factor in the decision to terminate him. Therefore, the court denies Sheriff Bryant's Motion for Summary Judgment as to Plaintiff's claim under §

---

[12] "The third prong is a question of fact best resolved on 'summary judgment only in those instances when there are no causal facts in dispute.'" Lane v. Anderson, 660 F. App'x 185, 191 (4th Cir. 2016) (quoting Love–Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004)).

[13] The Notice of Termination establishes that Plaintiff was possibly terminated because he conveyed information in violation of the YCSO's confidentiality provisions. (ECF No. 145-6 at 260 (referencing (ECF No. 145-6 at 221 § VII ¶¶ 1–3.))

[14] "The NET-101 is the online method for replying to unemployment claims filed by employees or Request for Separation Information." South Carolina Business One Stop, https://www.scbos.sc.gov/Partners_/DEWNET101 (last visited June 19, 2017). The NET-101 states that Plaintiff was terminated for "Unsatisfactory Work/Performance" based on the "Violation of Code of Ethics, Employee Rules of Conduct and Confidential I[n]formation Policy of the York County Sheriff's Office." (ECF No. 155-6 at 5.) Moreover, Plaintiff's work performance "[h]urt [the] credibility of [the] Sheriff's office." (Id.)

1983 alleging violation of his right to free speech under the First Amendment.

In addition to his outright opposition to Plaintiff's First Amendment § 1983 claim, Sheriff Bryant also contends he is entitled to qualified immunity. Because the aforementioned three-part inquiry resulted in a finding that Plaintiff's speech should be accorded First Amendment protection, the court now only has to consider whether such rights were "clearly established" at the time of the events at issue. This analysis does "not require a case directly on point" in order to conclude that the law was clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." Liverman v. City of Petersburg, 844 F.3d 400, 411 (4th Cir. 2016) (citing Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011)). Upon review, the court is inclined to find that qualified immunity is not applicable because a reasonable officer in Sheriff's Bryant's position would have known of the clearly established right to free speech and that Plaintiff's termination violated that right. See Hunter, 789 F.3d at 401–02.[15]

---

[15] In Hunter, the Fourth Circuit opined:

> Turning to the right at issue here—namely First Amendment expressive rights of public employees—we have expressly held that "it was clearly established in the law of this Circuit in September 2009 that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected." Durham, 737 F.3d at 303–04 (citation omitted). As discussed in greater detail above, in Durham, a police officer claimed he was terminated in retaliation for speaking out about law enforcement misconduct. The plaintiff officer wrote a report about an incident involving the use of force and refused to bow to pressure to revise the report. After the plaintiff officer sent written materials including the report to, among others, the Governor of Maryland, he was fired. We called this situation "no ordinary workplace dispute" and made clear that "where public employees are speaking out on government misconduct, their speech warrants protection." Id. at 303 (quotation marks and citation omitted).
>
> In holding that "it was clearly established in the law of this Circuit" in 2009 that "an employee's speech about serious governmental misconduct," and especially "serious misconduct in a law enforcement agency, is protected," Durham, 737 F.3d at 303–04, we relied on Andrew, 561 F.3d at 266–68. In Andrew, we concluded that an officer had stated a claim under the First Amendment where he

3. *Sheriff's Bryant's Alleged Deprivation of a Liberty Interest*

As the basis for his procedural due process claim for deprivation of a liberty interest, Plaintiff asserts that Sheriff Bryant's conduct deprived him of further job opportunities in law enforcement. (E.g., ECF No. 155 at 31–32.) The first inquiry regarding this type of claim focuses on whether the communications complained of "constitute a charge of serious character defect" implying "the existence of serious character defects such as dishonesty or immorality." Ridpath, 447 F.3d at 308 (citation omitted). Viewing the facts in the light most favorable to Plaintiff, the court finds that Sheriff Bryant's comments at the November 12, 2013 press conference in conjunction with documentation created by the YCSO to communicate that Plaintiff was terminated for violating the YCSO's Code of Ethics and Rules of Conduct (i.e., the Notice of Termination and the NET-101) do not fall within the realm of conduct that could imply "serious character defect." See, e.g., Brown v. Montgomery County, 470 F. App'x 87, 91 (3d Cir. 2012) (claim by plaintiff that defendants published articles in newspapers referring to employees' conduct as "malfeasance" and claiming that "employees violated county code by having alcohol on county property [and] . . . violated the county's code of ethics by engaging in inappropriate behavior" did not satisfy the stigma prong of the stigma-plus test). Therefore,

---

alleged retaliation for releasing to the media an internal report he had authored questioning a police shooting and the investigation into the shooting. Id. at 261–62. As Judge Wilkinson noted in his concurring opinion, it would be "inimical to First Amendment principles to treat too summarily those who bring, often at some personal risk, [the government's] operations into public view." Id. at 273 (Wilkinson, J., concurring). In Judge Wilkinson's lyrical words, "[i]t is vital to the health of our polity that the functioning of the ever more complex and powerful machinery of government not become democracy's dark lagoon." Id.

Andrew and Durham clearly established that, long before the December 2011 speech and retaliation at issue here, "speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected." Durham, 737 F.3d at 303–04 (citation omitted).

Hunter, 789 F.3d at 401–02.

because the aforementioned communications were not sufficiently stigmatizing, the court finds that Plaintiff's evidence fails to sufficiently implicate a liberty interest under the Due Process Clause.  Accordingly, Sheriff Bryant is entitled to summary judgment as to this claim.

     *4. Sheriff's Bryant's Alleged Deprivation of a Property Interest*

In this action, Plaintiff has attempted to assert that Sheriff Bryant deprived him of a protected property interest in his job as a Master Control Specialist in violation of the Due Process Clause of the Fourteenth Amendment.  "Whether a plaintiff has a protectable property interest under the Due Process Clause turns upon the plaintiff's property rights under state law." Foreman v. Griffith, 81 F. App'x 432, 436 (4th Cir. 2003) (citing Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)).  Here, Plaintiff does not contest that he was employed at-will by the YCSO.  Moreover, Plaintiff fails to identify any employment policy or mutually explicit understanding that would support a claim of entitlement to his employment as a correctional officer.[16]  As such, he is unable to assert any property interest in his continued employment with the YCSO.  Accordingly, Sheriff Bryant is entitled to summary judgment on Plaintiff's claim alleging a property interest protected by procedural due process.

## V.   CONCLUSION

Upon careful consideration of the entire record, the court hereby **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment (ECF No. 145) of Defendants York County and Sheriff Bruce Bryant, individually and in his official capacity as York County

---

[16] Although Plaintiff may have been entitled to challenge his termination through the Detention Center's employee grievance policy (see ECF No. 145-6 at 225–26), "such grievance rights do not establish a property interest in employment."  See Newton v. S.C. Dep't of Pub. Safety, C.A. No. 6:10-cv-01781-JMC, 2011 WL 4435761, at *3 n.1 (D.S.C. Sept. 23, 2011) (citing Bunting v. City of Columbia, 639 F.2d 1090, 1093–95 (4th Cir. 1981)).  The court notes that Plaintiff acknowledged reviewing the applicable grievance policy, but did not attempt to use it.  (ECF No. 145-6 at 29:22–30:5.)

Sheriff.  The Motion is granted with prejudice as to Plaintiff's claims against Defendant York County.  In addition, the Motion is granted with respect to Plaintiff's claims against Defendant Sheriff Bryant alleging infringement of a liberty interest and a property interest protected by procedural due process. The Motion is denied without prejudice as to the claims against Defendant Sheriff Bryant alleging infringement of Plaintiff's First Amendment rights.   The parties are directed to submit a joint proposed amended scheduling order within 10 days of the entry date of this Order.

Additionally, based on the posture of the matter as a result of the findings stated herein, the court does not believe a continuance is necessary and, therefore, it **DENIES** the parties' Joint Motion to Continue Trial.  (ECF No. 170.)

IT IS SO ORDERED.

J. Michelle Childs

United States District Judge

June 20, 2017
Columbia, South Carolina