# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ROCK HILL DIVISION

| | |
|---|---|
| Michael Billioni, | Civil Action No.: 0:14-cv-03060-JMC |
| Plaintiff, | |
| v. | **ORDER AND OPINION** |
| York County and Sheriff Bruce Bryant, individually and in his official capacity as York County Sheriff, | |
| Defendants. | |

Plaintiff Michael Billioni filed this action against Defendants York County and Sheriff Bruce Bryant, individually and in his official capacity as York County Sheriff ("Sheriff Bryant"), (together "Defendants") seeking damages and injunctive relief stemming from the termination of his employment. (ECF No. 120.) On June 20, 2017, the court entered an Order and Opinion (ECF No. 171) that denied Defendants' Motion for Summary Judgment (ECF No. 145) as to Plaintiff's claim alleging infringement of his right to free speech under the First Amendment for comments made to his wife regarding what he saw on a video recording of the events surrounding the death of an inmate named Joshua Grose at the York County Detention Center. While the June 20, 2017 decision was on appeal (*see* ECF No. 177), the Court of Appeals for the Fourth Circuit filed an opinion on January 2, 2019, which vacated this court's June 20, 2017 decision regarding Plaintiff's First Amendment claim and ordered the court "to apply the correct legal standard to determine whether Billioni's speech is protected under the First Amendment." (ECF No. 193 at 15.) After the remand from the Fourth Circuit, this court entered an Order on October 10, 2019 (the "October Order"), that granted Defendants' Motion for Summary Judgment as to the claims against Sheriff Bryant alleging infringement of Plaintiff's First

1

Amendment rights. (ECF No. 213.)

This matter is before the court on Plaintiff's Motion for Reconsideration of the October Order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, which was filed on November 7, 2019. (ECF No. 221.) Specifically, Plaintiff seeks reconsideration of the October Order "to correct a clear error of law and prevent manifest injustice upon which the judgment rests." (*Id.* at 1.) Sheriff Bryant opposes Plaintiff's Motion in its entirety. (ECF No. 224.) For the reasons set forth below, the court **DENIES** Plaintiff's Motion for Reconsideration.

## I. RELEVANT BACKGROUND TO PENDING MOTION

In denying Defendants' Motion for Summary Judgment regarding Plaintiff's First Amendment claim, the court expressly found that (1) "Sheriff Bryant did not make any showing of disruption within the YCSO[1] due to the statements made by Plaintiff to his wife," (2) "any disruption caused by the internal investigation that was conducted by the YCSO, . . . is clearly outweighed 'by the public's interest in the disclosure of misconduct or malfeasance,'" (3) there was an issue of fact as to whether "Plaintiff's protected speech was a substantial factor in the decision to terminate him," and (4) Sheriff Bryant was not entitled to qualified immunity. (ECF No. 171 at 23–25.) In its Order reversing the denial of summary judgment, the Fourth Circuit held that this court "used the incorrect 'actual disruption' standard[2] instead of the 'reasonable apprehension of disruption' standard." (ECF No. 193 at 12 (citing *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992)).) The Fourth Circuit further remanded the matter for the court "to use the correct legal standard to determine whether the evidence permits a conclusion that a reasonable factfinder could find that Sheriff Bryant reasonably apprehended disruption within

---

[1] YCSO stands for York County Sheriff's Office.
[2] The court observes that it did not use the phrase "actual disruption" in its June 20, 2017 Order and Opinion. (ECF No. 171.)

the YCSO[,] as a result of Billioni telling his wife about the surveillance video[,] that outweighs Billioni's interest in speaking out about the surveillance video." (*Id.* at 13.) On remand, the court made the following observations in the October Order in granting Defendants' Motion for Summary Judgment:

> As the second prong of the test the Fourth Circuit described in *McVey v. Stacey*, 157 F.3d. 271 (4th Cir. 1998), the court balances "whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." *Id.* at 277; *see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). "The public's interest in hearing the employee's speech also weighs in the balance: 'A stronger showing of public interest in the speech requires a concomitantly stronger showing of government–employer interest to overcome it.'" *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (quoting *McVey*, 157 F.3d at 279). "Whether the employee's interest in speaking outweighs the government's interest is a question of law for the court." *Smith v. Gilchrist*, 749 F.3d 302, 309 (4th Cir. 2014) (citing *Joyner v. Lancaster*, 815 F.2d 20, 23 (4th Cir. 1987)). Moreover, when balancing the competing interests, the public employer is not required "to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was "reasonably to be apprehended." *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (citing *Jurgensen v. Fairfax Cty., Va.*, 745 F.2d 868, 879 (4th Cir. 1984)).
>
> To accomplish this balancing, the court "must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency." *McVey*, 157 F.3d at 278 (citing *Rankin v. McPherson*, 483 U.S. 378, 388–91 (1987)). "Factors relevant to this inquiry include whether the employee's speech (1) 'impairs discipline by superiors'; (2) impairs 'harmony among co-workers'; (3) 'has a detrimental impact on close working relationships'; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the 'responsibilities of the employee within the agency'; and (9) makes use of the 'authority and public accountability the employee's role entails.'" *Id.* (quoting/citing *Rankin*, 483 U.S. at 388–91). "Of particular relevance to this case, police entities have a uniquely strong interest in maintaining orderly operations because they are 'paramilitary,' such that 'discipline is demanded, and freedom must be correspondingly denied.'" *Supinger v. Virginia*, 259 F. Supp. 3d 419, 446 (W.D. Va. 2017) (quoting *Maciariello*, 973 F.2d at 300).

3

. . .

In attempting to balance the disruptiveness of Plaintiff's speech and its First Amendment value, the court observes that the record does not support any finding that Plaintiff's speech impaired the maintenance of discipline at the YCSO, hurt workplace morale, or impeded Plaintiff from carrying out his duties. However, as emphasized in the following paragraph, the court finds that the evidence is uncontroverted that Plaintiff's speech substantially interfered with the efficient operation of the YCSO and the investigation into the events surrounding Joshua Grose's death:

> Plaintiff here knew that the State Law Enforcement Division, an independent state agency, was investigating the death. He knew SLED had access to the same information and videos he did. In fact, SLED had access to more information than Plaintiff because SLED investigators interviewed the officers involved in the incident – which Sheriff Bryant had requested immediately upon learning of Grose's death. Yet Plaintiff gave SLED's investigation no chance to reach a conclusion before Plaintiff ran to the media (his wife) to accuse his fellow officers and superiors of misconduct. Nor did Plaintiff take whatever concerns he had to his superiors, or to SLED.

(ECF No. 204 at 12.) In this regard, the court agrees with Sheriff Bryant that "Plaintiff's interest in rushing to judge his colleagues based on incomplete information" does not outweigh "the Sheriff's interest in enforcing a policy [or policies] designed to provide the public with accurate information" regarding the Grose investigation. (*Id.* at 23); *see also Shelton Police Union, Inc. v. Voccola*, 125 F. Supp. 2d 604, 625 (D. Conn. 2001) ("In order to function effectively, the police department must have control over statements attributed to it and must be able to protect information about pending investigations so as not to put the investigation or those involved in it at risk."). Therefore, the court finds that Plaintiff cannot satisfy the second prong of the *McVey* test. Accordingly, the court concludes that his speech is not protected by the First Amendment as a matter of law.

(ECF No. 213 at 4–5, 8–9.)

Plaintiff seeks reconsideration of the October Order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. The court heard argument from the parties on the Motion for Reconsideration at a hearing on February 19, 2020. (ECF No. 233.)

## II. JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 based on

Plaintiff's claims against Defendants under 42 U.S.C. § 1983, which permits an injured party to bring a civil action against a person who, acting under color of state law, ordinance, regulation, or custom, causes the injured party to be deprived of "any rights, privileges, or immunities secured by the Constitution and laws." *Id.*

### III.    LEGAL STANDARD

Rule 59 allows a party to seek an alteration or amendment of a previous order of the court. Fed. R. Civ. P. 59(e). Under Rule 59(e), a court may "alter or amend the judgment if the movant shows either (1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice." *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 407 (4th Cir. 2010); *see also Collison v. Int'l Chem. Workers Union*, 34 F.3d 233, 235 (4th Cir. 1994). It is the moving party's burden to establish one of these three grounds in order to obtain relief. *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 285 (4th Cir. 2012). The decision whether to reconsider an order under Rule 59(e) is within the sound discretion of the district court. *Hughes v. Bedsole*, 48 F.3d 1376, 1382 (4th Cir. 1995). A motion to reconsider should not be used as a "vehicle for rearguing the law, raising new arguments, or petitioning a court to change its mind." *Lyles v. Reynolds*, C/A No. 4:14-1063-TMC, 2016 WL 1427324, at *1 (D.S.C. Apr. 12, 2016) (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)).

### IV.    ANALYSIS

A.    <u>Plaintiff's Arguments for Reconsideration</u>

In his Motion, Plaintiff prefaces his arguments with the contention that in the October Order, [t]he [c]ourt essentially concludes that having to perform a thorough and complete investigation into allegations of serious misconduct and cover up in the death of a civilian while

5

in a restraint chair is per se so disruptive so as to outweigh the public interest." (ECF No. 221 at 7.) Plaintiff further contends tongue-not-in-cheek that Sheriff Bryant himself was responsible for creating "the disruption [at issue] by holding the press conference before the conclusion of the SLED investigation and by knowingly misleading the public about Mr. Grose's death." (*Id.* at 3.) As a result of the foregoing, Plaintiff argues that he is entitled to reconsideration of the October Order because the court's decision contravenes Fourth Circuit "precedent set forth in *Durham v. Jones*, 737 F.3d 291 (4th Cir. 2013); [and] *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009)." (ECF No. 221 at 7–8.)

In support of his argument, Plaintiff first asserts that *Andrew* "establishes that exposing corruption, including matters dealing with excessive force, within a police department are clearly matters of public concern." (*Id.* at 8–9.) Plaintiff next asserts that *Durham* demonstrates that "it is not enough that there is some disruption; the amount of disruption has to outweigh the importance of the speech and its concern to the public." (*Id.* at 11 (citing *Durham*, 737 F.3d at 302).) Moreover, Plaintiff asserts that "*Durham* states that spending time, [*i.e.*,] devoting resources to an investigation arising from a speech regarding a matter of great public concern is insufficient." (*Id.* at 14.) To this point, Plaintiff asserts that "[i]n order to shift the balance in favor of the employer the government would have to show significant apprehension of disruption." (*Id.* at 12 (referencing *Lane v. Anderson*, 660 F. App'x 185 (4th Cir. 2016).)

Based on his review of these cases, Plaintiff concludes that "[w]hen the *Durham* standard is applied it is evident that Billioni's speech about serious law enforcement misconduct outweighed any alleged disruption, especially disruption connected to investigating the allegations." (*Id.* at 15.) Accordingly, Plaintiff believes that "Sheriff Bryant is not entitled to summary judgment or [] qualified immunity." (*Id.* at 17.)

B.   The Court's Review

Plaintiff is seeking reconsideration of the October Order on the basis that the court's decision was either a clear error of law[3] or resulted in manifest injustice.[4] He is steadfast in his belief that the court should reconsider the balancing test conducted in the October Order because "there remains no real evidence about credible apprehension of disruption caused by Billioni as required by the Fourth Circuit." (ECF No. 221 at 14.) Moreover, in response to the court's observations in the October Order regarding Sheriff Bryant's evidentiary presentation as to his apprehension of a disruption caused by conflicting reports about the events surrounding Grose's death,[5] Plaintiff's attorney argues that the court erred in its determination for the following reasons:

---

[3] Clear error occurs when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Harvey*, 532 F.3d 326, 336 (4th Cir. 2008) (internal quotation marks omitted); *see also United States v. Martinez–Melgar*, 591 F.3d 733, 738 (4th Cir. 2010) ("[C]lear error occurs when a district court's factual findings are against the clear weight of the evidence considered as a whole.") (internal quotation marks omitted); *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 n.5 (4th Cir. 1983) (explaining that a district court's factual finding is clearly erroneous if "the finding is against the great preponderance of the evidence") (internal quotation marks omitted).

[4] Manifest injustice occurs where the court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension . . . ." *Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1292–93 (S.D. Fla. 2012) (citations omitted).

[5] In the October Order, the court quoted the following testimony from Sheriff Bryant's deposition:

Q: What was your response to Ms. [Kris] Jordan[, Sheriff's Office General Counsel], after she told you about this phone call [from local television reporter Stuart Watson]?
A: My response was that we needed to get to the bottom of that. I do recall that that bothered me a lot. The reason was that she was telling me things that I had not heard from my staff.
Q: Other than the information about the strikes to the head, what other specific information did you gain from her as a result of the conversation?
A: I can't remember the exact information that Kristie passed to me in regard to that or what all Stuart Watson [the reporter] told her. The amount of information that she passed on to me caused me concern, and I wanted to get to the bottom of it for

> Sheriff Bryant claims a reasonable apprehension of disruption because he had to order his staff to look into the allegations and determine if there was a witness who saw something that had not been reported. This argument is disingenuous. First, the Sheriff, and his command staff, knew the video captured Mr. Grose's death as well as all the events leading up to it. Therefore, they knew it was not possible there was a witness who saw something that was not reported. Also there was nothing written in the newspaper stating that Grose was hit in the head. Notably, Sheriff Bryant testified he can't remember the exact information that Kristie [General Counsel] passed to him in regard to that or what all Stuart Watson [the reporter] told him. (ECF No. 145-9 at 9:18–10:11.) There is nothing in the record, from either Mr. Watson, from the General Counsel, Billioni or anyone else attributing the statement that Mr. Grose was struck twelve times in the head to Mr. Billioni's speech. Lastly, instead of devoting resources to clear-up this information, all Sheriff Bryant had to do was comply with Mr. Watson's FOIA request and release the video. The Sheriff is merely paying "lip service" to the idea that Billioni's speech created a reasonable apprehension of disruption. In reality the disruption was caused by Sheriff Bryant's providing the public with incomplete and inaccurate information about details surrounding Mr. Grose's in-custody death.

(ECF No. 221 at 5–6.) While Plaintiff clearly suggests that he is not responsible for Sheriff Bryant's belief that the officers struck Grose in the head twelve times, this misconception is a distinction without a difference. Sheriff Bryant's testimony is evidence regarding his apprehension of a disruption and is entitled to some weight, possibly heightened weight, because he is a law enforcement official. *See, e.g.*, *Maciariello*, 973 F.2d at 300 ("[G]reater latitude is afforded to police department officials in dealing with dissension in their ranks." (citation omitted)).

Upon its consideration of Plaintiff's arguments, the court observes that even if Sheriff Bryant's apprehension about a disruption in his office caused by conflicting reports about the events surrounding Grose's death is entitled to little weight, that amount is still greater than the

---

> the mere fact that I didn't want false accusations about what went on in my facility. As a result, I informed my staff that we had to get to the bottom of it, and I wanted to know if we had a witness over there that saw something, that we hadn't talked to or knew something that we didn't know.

(ECF No. 213 at 7 (quoting ECF No. 145-9 at 9:18–10:11).)

First Amendment value of Plaintiff's speech. The speech at issue is as follows:

> Q. The question was what did you tell your wife about your concerns with what you saw on the video about Mr. Grose?
> A. When I came home and told my wife, I told my wife that they –
> . . .
> A. I told her that he had gotten struck 12 times, in the course of the incident that led to his death.
> Q. Did you tell her anything else?
> A. I did tell her that other officers were there and did nothing.
> Q. Anything else?
> A. Not that I can remember.
> . . .
> A. I had told her about who was there.
> Q. Who was there? Did you name names?
> A. Yes.
> Q. Were these people she knew?
> A. She knew of.
> Q. And then what did she say to you?
> A. I don't remember.
> . . .
> Q. You said you told her that Mr. Grose was struck 12 times. I mean, what other details about his restraint did you give her?
> A. I told her that they fought with him and, in that fight, you see [Officer James] Moore emerge and state - - stand in front of him and punch him 12 times.
> Q. What else?
> A. That's it.

(ECF No. 145-6 at 65:2–6, 15–22, 69:9–15, 71:10–17.) Plaintiff testified that he told his wife about what he saw on the video of the Grose incident because he disagreed with the statement by Sheriff Bryant's public information officer at an October 20, 2013 press conference that "[a]ll our officers, detention officers, did exactly what they were supposed to do last night" regarding the incident involving Grose.[6] (ECF No. 145-10 at 61:13–14.) Plaintiff further claims that the

---

[6] Plaintiff offered the following testimony to explain his reasoning for telling his wife about the Grose incident:

> A. As I sit here today, the reason why I watched the video was not out of morbid curiosity. But what was said, in that press conference, was everybody did exactly what they were supposed to do that night. And how could somebody die, if they did everything exactly they were supposed to do that night.

(ECF No. 145-6 at 48:22–49:3.)

9

communication to his wife is protected by the First Amendment because he was exposing "serious misconduct" by a law enforcement agency. (ECF No. 120 at 10 ¶ 60, 11 ¶ 61.)

However, the significance of Plaintiff's communication to his wife is diminished by admissions made throughout his deposition testimony. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999) ("In performing this balancing test, this court has recognized that we should first assess the value, from the First Amendment perspective, of the employee's speech. We should then assess the time, place, and manner of the speech at issue, as well as the context in which the dispute arose." (internal and external citations omitted)). First, Plaintiff expressly states that at the time he heard it, he did not have any credible evidence contradicting the statement by Sheriff Bryant's public information officer that officers did what they were supposed to do. (ECF No. 145-6 at 50:1–6.) More importantly, Plaintiff's concerns regarding alleged misconduct by Officer Moore were admittedly based on such limited facts[7] that he never

---

    A. No. But, again, the public information officer used the term, everybody did exactly what they were supposed to last night.

(*Id.* at 69:2–4.)

    A. Well, I was afraid that I was going to lose my job because their dirty little secret got out that everything didn't go down exactly the way it was supposed to go down. This officer [Moore] beat the inmate. He had beaten inmates before, and now it's out.

(*Id.* at 107:1–6.)

    A. Because I divulged confidential information that the public had a right to know about, and he fired me for it; confidential information that should've been made public from the beginning. Either you say you did something wrong or you don't say, we did everything we were supposed to do, when it clearly wasn't the case.

(ECF No. 145-6 at 151:16–22.)

[7] Plaintiff testified as follows regarding his knowledge of the Grose incident:

    Q. Did you have any interaction, personally, with Mr. Grose?
    A. No.
    Q. Were you on duty, at any point, when he was detained here at the detention –
    A. No.

felt the need to convey them to anyone within his chain of command.⁸ Second, despite the alleged gravity and urgency of his concerns, Plaintiff did not feel the need to either urge his wife to take those concerns to the media outlet she worked for or immediately convey them to an independent investigative agency. (*Id.* at 57:8–57:21, 69:23–25.) Finally, at the time he spoke to his wife, Plaintiff admits that he knew that SLED, an investigative agency independent from the YCSO, was investigating the Grose incident and that agency had the ability to determine evidence of wrongdoing involving the in-custody death of an inmate.⁹ (ECF No. 145-6 at

---

(ECF No. 145-6 at 44:5–10.)

> Q. During that time, you didn't speak with any of the officers that actually were involved in trying to restrain him, did you?
> A. No.

(*Id.* at 46:16–19.)
⁸ In response to questions about Officer James Moore, Plaintiff testified as follows:

> Q. What did you tell your wife?
> A. I had raised concerns about Moore striking an inmate in a restraint chair, earlier that year to her.
> Q. But you didn't tell anyone, within your chain of command, that you had a concern about that.
> A. No. Because that particular incident, I felt that they were actually handling it.

(ECF No. 145-6 at 59:11–18.)

> Q. All right. But, prior to this incident, you yourself agreed that the sheriff's office had handled his [Moore] previous incident appropriately.
> A. I believe that it appeared that they handled it appropriately.

(*Id.* at 148:18–22.)

> A. Personally, I don't think he [Moore] should've kept his job, after that first incident.
> Q. Okay. But that obviously wasn't your call, was it?
> A. No, it wasn't.
> Q. And you didn't investigate what happened.
> A. No.
> Q. So you don't really know what happened. You weren't there, right? Right?
> A. Sure.

(*Id.* at 149:15–24.)
⁹ This admission alone can be enough to cause the weight of the balancing to shift in favor of Sheriff Bryant. *See Signore v. City of Montgomery, Ala.*, 354 F. Supp. 2d 1290, 1296 (M.D. Ala.

11

112:19–113:4, 119:3–8, 142:17–25.)

The cases cited by Plaintiff are distinguishable from this case because those cases do not address a situation wherein the evidence in the record demonstrates that Plaintiff's allegations of misconduct are determined to be unfounded by an external investigation happening simultaneous to when he made his communication.[10] To this point, the results of the SLED investigation were then reviewed by the Solicitor's Office for the 16th Judicial Circuit of the State of South Carolina, a second, independent agency. The Solicitor's Office authored documentation included in the record which establishes that "there exists no evidence of criminal conduct on the part of any individual involved in maintaining the custody and control of Mr. Grose during his incarceration" and "[t]he force used to restrain him was reasonable and appropriate given the circumstances the officers faced." (ECF No. 145-6 at 266.) Furthermore, there is documentation in the record written by the Section Chief from the Criminal Section of the United States Department of Justice, a third, independent investigative agency, that contains a finding that "the

---

1989) ("This court is persuaded by the reasoning of the *Orange* [*v. District of Columbia*, 59 F.3d 1267 (D.C. Cir. 1995)] that disclosure of information about an ongoing investigation can cause the *Pickering* balancing test to weigh in favor of a police department.").

[10] In addition, the court observes that *Andrew* and *Lane* are distinguishable because those appeals involved decisions by the district court at the Rule 12 stage. *See, e.g., Cummings v. City of Wheeling, W. Va.*, C/A No. 5:19CV271, 2019 WL 6609693, at *2 (N.D. W. Va. Dec. 5, 2019) ("It has often been said that the purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case. The Rule 12(b)(6) motion also must be distinguished from a motion for summary judgment under Federal Rule of Civil Procedure 56, which goes to the merits of the claim and is designed to test whether there is a genuine issue of material fact." (internal and external citations omitted)). The district court's decision in *Durham* is also distinguishable because that appeal involved issues occurring during the post-trial phase wherein the trial court had the benefit of jury findings. *See Durham*, 737 F.3d at 303 ("[W]e find that the district court was right to conclude, on the present record, that Durham's interests outweighed those on the other side; Durham proved, as the jury found, that he suffered a constitutional injury."). *Cf. Frantz v. City of Pontiac*, No. 04-CV-72904, 2007 WL 107773, at *5 (E.D. Mich. Jan. 9, 2007) ("Plaintiff distinguishes cases relied on by the City, pointing out that several cases . . . were at the post-trial stage of proceedings, not subject to the same standard as the summary judgment examination employed by the courts.").

evidence [from the Grose incident] does not establish a prosecutable violation of the federal criminal civil rights statutes." (ECF No. 145-6 at 237.)

Based on the foregoing, the court concludes that the weight of the value of Plaintiff's speech is negligible at worst, significantly diminished at best, and does not surpass the weight of Sheriff Bryant's reasonable apprehension of a disruption.[11] *See McMurphy v. City of Flushing*, 802 F.2d 191, 195 (6th Cir. 1986) ("Even with respect to the allegations of official corruption, a matter of obvious concern to the public, the court found that a balancing of interests clearly favored the defendants. The charges were considered unfounded when investigated by outside agencies."). Therefore, after considering Plaintiff's arguments, the court finds that reconsideration of the October Order is not required to either avoid manifest injustice or correct a clear error of law.

## V. CONCLUSION

For the reasons set forth above, the court hereby **DENIES** Plaintiff Michael Billioni's Motion for Reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. (ECF No. 221.)

---

[11] The court observes that it was unable to locate a Fourth Circuit decision expressly addressing the issue of what weight should be accorded to post-communication external investigation results. However, in attempting to conduct the aforementioned balancing, the court evaluated a situation in which Sheriff Bryant's denial of wrongdoing by his office (*see, e.g.*, ECF No. 145-8 at 180:18–19:5) is also substantiated by the lack of evidence presented by Plaintiff of either clearly defined misconduct or a violation of policy, procedure, or practice. In this regard, the court's finding in no way is meant as a requirement on Plaintiff to prove the truth of his speech in order to secure First Amendment protection. *See McVey v. Va. Highlands Airport Comm'n*, 44 F. App'x 630, 638 (4th Cir. 2002) (Michael, M., concurring) ("A public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment." (quoting *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997)).

13

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

March 12, 2020
Columbia, South Carolina